RECEIVED

MAY 2 8 2010

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE-OPELOUSAS DIVISION

COURTNEY SANDOZ                          CIVIL ACTION NO.: 07-1308

VERSUS                                   JUDGE DOHERTY

CINGULAR WIRELESS, LLC, ET AL            MAGISTRATE JUDGE HANNA

## RULING

"Plaintiff's Motion for Conditional Class Certification (Resubmitted)" [Doc. 67] was referred to United States Magistrate Judge Patrick J. Hanna for a Report and Recommendation. After an independent review of the record, the applicable statutory law and jurisprudence, and considering the objections filed, the Court ADOPTS IN PART the findings and recommendation of the magistrate judge. Specifically, the Court adopts (and supplements herein) the sections entitled "Factual and Procedural Background," "Argument of Parties," "Applicable Law and Discussion" [Id. at 1-11]; the Court DECLINES TO ADOPT the section entitled "Minimum Wage Violation" [Id. at 11-14]; and the Court ADOPTS the conclusion contained in the section entitled "Recordkeeping Violation" [Id. at 15-16], although for different reasons than those cited by the Magistrate Judge.

### Factual and Procedural Background

Courtney Sandoz worked for defendants as a part-time retail sales consultant ("RSC") in Lafayette, Louisiana, from October 10, 2004 until September 30, 2005. [Doc.1-1] Plaintiff filed this action in Lafayette Parish state court on or about April 23, 2007, individually and as an opt-in collective action under the Fair Labor Standards Act, 29 U.S.C. § 216(b), arguing Cingular's

1

payment policy for part-time workers violated the minimum wage provisions of the FLSA, 29 U.S.C.

§ 206.  Specifically, plaintiff avers, in pertinent part:

2.

This is an action for penalties and attorneys fees under the Fair Labor Standards Act, 29 USCA § 206 and § 216 ("FLSA") for Defendants' failure to timely pay minimum wages for hours worked.[1]

3.

Plaintiff was employed by Defendant in Lafayette Parish, Louisiana as a part time Retail Sales Consultant (RSC) from October 10, 2004 to September 30, 2005.

4.

Defendant defined a part time RSC as one who was regularly scheduled to work nineteen (19) hours per week, which Cingular called "regular hours".[2]

5.

Defendant regularly scheduled Plaintiff and other similarly situated part time RSC employees to work more than nineteen hours per week.  Cingular classified work hours over nineteen in a work week for those employees as Exception Time.[3]

6.

Defendant consistently failed to pay Plaintiff and other similarly situated employees any wages for scheduled Exception Time on the next regular paycheck, as required by 29 USCA § 206.

7.

Although Exception Time was entered on an employee time sheet in the scheduled hours section, Defendant's policy was to not pay any wages for Exception

---

[1]Defendant denies all allegations contained in the Complaint which are referenced above, unless noted otherwise. [Doc. 5, pp. 4-5]

[2]Defendant admits this allegation in its Answer. [Doc. 5, p.4] However, in later submissions to the Court, defendant seems to qualify its admission by stating an RSCs "'standard' hours vary form state to state and from year to year." [Doc. 48-2, ¶11] Additionally, defendant states "from April of 2004 until early 2006, retail stores in Louisiana hired part-time RSCs with standard hours of 19 per week," while stores in other states had different "standard hours" for RSCs. [Id.]

[3]Defendant admits the allegations in the second sentence of this paragraph. [Doc. 5, p.5] Although defendant denies the allegations in the first sentence of paragraph 5 "as written" [Id.], in a later submission to the Court, defendant testifies during plaintiff's term of employment, Louisiana RSCs "standard hours" constituted 19 hours per week, however, "[t]hese employees were considered 19 hour employees although they could work more or less hours per week depending on store needs or an RSC's desire for more hours . . . ." [Doc. 48-2, ¶11]

Time in the next pay check if the store manager failed to verify the hours worked in a separate time entry report.

8.

In such cases Defendants paid wages for only nineteen "regular hours" in the next pay check at the employee's regular rate. The effect was to pay Plaintiff and other similarly situated employees a sub-minimum wage in the next check for all hours worked in each week an employee was scheduled to work more than thirty four hours.

9.

Defendants' practice violated 29 USCA § 206, which requires an employer to pay an employee in the next regular pay check for all hours worked in a workweek at a rate not less than the minimum wage. Where it is not possible to determine the actual time worked before the payroll entry deadline, the law requires payment for all scheduled hours at not less than minimum wage in the next check, and permits later adjustments for full wages at the employer's regular rate and for overtime.

[Doc. 1-1, pp. 1-2] Plaintiff asserts defendants are "liable to Plaintiff and similarly situated part time Retail Sales Consultants for penalties and liquidated damages in an amount equal to and in addition to the late paid minimum wages," and "for the plaintiffs' reasonable attorneys fees and expenses, pre judgment and post judgment interest on the award, costs and for all other legal, or equitable relief which this Court may deem appropriate." [Doc. 1-1, ¶11, p.4 (prayer for relief)]

Defendant describes its pay structure for RSCs as follows:

To assist with staffing needs, some stores employ RSCs on a part-time basis, although the number of part-time RSCs and their "standard" hours vary from state to state and from year to year. For example, from April 2004 through early 2006, retail stores in Louisiana hired part-time RSCs for a standard 19 hour week. Those employees were considered 19-hour employees, although they could work more or less hours per week depending on store needs or a particular RSC's desire to work more hours. By way of comparison, during the same time period, stores in Mississippi and Alabama hired part-time RSCs to work standard weeks of anywhere from 19 to 32 hours per week. Since 2006, however, stores in Louisiana, Mississippi, and Alabama have typically hired part-time RSCs to work 25 hours per week.

. . .

Plaintiff was employed by Defendants as a part-time (19 hours per week)

3

RSC . . . . Although Plaintiff was categorized as a 19-hour per week employee, she often worked more than 19 hours per week. At the time Plaintiff worked for Defendants, any time worked by an hourly employee, such as Plaintiff, in excess of her standard hours per work was referred to as "exception time," referring to the fact that the hours worked were an exception to the employee's standard hours.

[Doc. 48, pp. 3-5 (internal citations and footnotes omitted)]

The policy and procedure for payment of exception time is *described by defendant* (and cited by plaintiff in support of her allegations) as follows:

During the Relevant Period, hourly employees were required to record their work hours on timesheets provided by Defendants, and to turn those timesheets in to their store managers on or before the second Saturday at the end of their two week pay period. The store manager was required to verify the time and enter it into the web based time entry system before 10:00 a.m. CT on the following Monday. All time entered into the system by 10:00 a.m. CT on the Monday following the end of the pay period was paid with the regular pay cycle on the following Friday. If no timesheet was submitted by the time entry deadline, the employee was paid the regular time.

[Docs. 17, p.3; 34-1, p.4; *see also* Doc. 48-1, ¶8]

The *policy itself* (entitled "Underpayment of Wages Due") states, in pertinent part, as follows:

**Underpayment of Wages Due**
Effective 8/16/04

Every employee is entitled to receive payment for wages earned on the appropriate payday. Wages include bi-weekly wages including differentials. To ensure accurate payment on payday, the employee and supervisor **must** verify the time reported and ensure it is entered by the time entry deadline. Any discrepancies should be reported to the employee's Manager who will inform the HQ Payroll Office immediately. . .
.

When the payment falls below wages earned and the department does not notify the Payroll Office prior to the submission deadline/Payroll cut off . . ., the employee, via their manager . . ., may request special payment processing . . . . If no special handling is requested, the correction should be entered into MSS/Web Time, Kronos or TAS. Once entered, the correction will automatically flow to PeopleSoft for payment on the employee's next paycheck. If special processing is requested, the

payment will be processed when administratively feasible based on the payroll processing cycle and volume of requests.

*Special processing situations only include underpayment of bi-weekly salary earned, dismissal of an employee in states where payment is mandated, or legal circumstances that require payment prior to the next regular payroll.*

*In most circumstances, underpayment of supplemental wages, such as paid time off etc, regardless of the dollar value, will be paid on the employee's next regular scheduled paycheck.*

. . .

Below are lists of earnings code [sic] that would be considered as:

| Bi-weekly Salary: | Supplemental: |
|---|---|
| Regular | Bonus |
| . . . | . . . [4] |

**How to Correct Underpayments**
Effective 8/16/04

Underpayments can occur for a variety of reasons and will be corrected by Cingular once they are researched and verified.  Some of the underlying causes of underpayments include, but are not limited to, exception time reported incorrectly or in error . . ., exception time not reported or not reported timely . . . .  The method of correcting underpayments differs by the circumstances in each case.  Below are procedures for the different methods of correcting underpayments.

If you have been underpaid, contact your Manager immediately.

[Docs. 48-2, pp. 7-8;  67-2 (emphasis in original)]

Immediately following the above-quoted policy language, the policy provides various reasons underpayments could occur, and the "Correction Method" for that particular "Underpayment Reason."  The first "Underpayment Reason" example is entitled "Time Reporting Error (exception

---

[4]Neither the "bi-weekly salary" listings, nor the "supplemental" salary listings contain the terms "standard hours" or "exception time." However, in the affidavit submitted by defendant of Kathleen K. Holdridge, defendant's Payroll Director, she attests, "Hourly employees, such as RSCs, are paid two types of remuneration by Defendants – bi-weekly and supplemental pay.  Bi-weekly refers to regular or standard time, exception time . . . .  Supplemental pay refers to . . . ." [Doc. 48-1, ¶6]

time submitted incorrectly, in error, or untimely resulting in *supplemental* pay being missed)."[5]  *Id.*
(emphasis added).  The "Correction Method" is stated as "Employee contacts his/her Manager[.]
Manager contacts Payroll Coordinator for instructions regarding correcting time via MSS, TAS or
Kronos.  The correction will appear on the next regular pay check. . . ."  The Court notes the
"Correction Method" for untimely submission of excess time does not identify making a request for
"special processing" as one of the options, which is in contradiction to the second paragraph of the
"Underpayment of Wages Policy," defendant's motion, and the affidavit of its Payroll Director.  In
fact, the only categories of "Underpayment Reason[s]" for which the "Correction Method" procedure
includes making a request for "special handling" are: "Incorrect Job Data (return from disability, but
not returned to active status in payroll system)," "Lost Check," "Direct Deposit Return,"and "Direct
Deposit Not In Employee's Account." [Id.]

       As previously noted, plaintiff alleges this policy caused her to be paid an amount **below
minimum wage for the actual hours worked, during pay periods** in which she: (1) worked more
than thirty four hours;  and (2) her exception time was not paid concurrently with her payment for
her regular 19 hours.  Plaintiff filed a motion for conditional class certification, seeking provisional
certification of a "collective or representative action pursuant to 29 USCA § 216(b)," consisting of
the following two classes:

           i. Class I  (Minimum Wage Violations):      All persons who were employed by
           Cingular as a part time Retail Sales Consultant at any time from and after April 23,
           2004 and who were scheduled to work more than thirty-four (34) hours in any week,
           and

_____

       [5]The Court notes the "Underpayment Reason" of "Time Reporting Error" seems on its face, done
to contradict the Payroll Director's statement in her affidavit that "exception time" is considered  the
"regular or standard time" rather than "supplemental pay." [*See* Doc. 48-1, ¶6, *see also supra* note 4]

ii. Class II (Record keeping Violations):     All persons who were employed by
Cingular as a part time Retail Sales Consultant at any time from and after April 23,
2004 . . . .

[Doc. 67, p.1; *see also* Doc. 34, p.1]  The motion was referred to the Magistrate Judge for report and

recommendation. [Docs.39, 68]  The Magistrate Judge recommended denial of the motion, based

on the following: (1) Plaintiff failed to show defendant's "Underpayment of Wages Due" policy

"constitute[s] a common 'policy or plan' violative of the FLSA"; (2) Plaintiff failed to show "there

are similarly situated potential opt-in plaintiffs, even assuming the policy was violative of the

FLSA"; and (3) "[P]laintiff has failed to make substantial allegations that the putative record keeping

violations class members were victims of any plan, policy, or decision that violated the cited record

keeping requirements." [Doc. 80, pp. 13, 14 and 16]

## Analysis

At the outset, it must be absolutely clear, and the reader must bear in mind, that the claim at

issue is not merely for "underpayment of wages due."   Stated more precisely, ***this claim***

***encompasses a claim for payments of less than minimum wage***, in violation of the FLSA.  The

FLSA requires that an employer pay each employee a minimum wage set by the Act. 29 U.S.C. §

206.[6]  **Section 206(b) mandates that "every employer shall pay" employees the minimum wage**

**if "in any workweek [the employee] is engaged in commerce."**  Although the Act does not provide

a time period in which employees must receive that pay, and there appears to be little jurisprudence

directly on point, several courts have held explicitly, and other courts appear to have implicitly

recognized, that the FLSA "requires an employee to be *paid* the minimum wage for each hour

worked during the pay period."  *Olson v. Superior Pontiact-GMC, Inc.*, 765 F.2d 1570, 1578 (11[th]

---

[6]At the time of plaintiff's employment, minimum wage was $5.15 per hour.  29 U.S.C.A. § 206
(West 1996).

Cir. 1985)(emphasis in original), *modified on reh'g*, 776 F.2d 265, (citing *Mitchell v. Mitchell Truck Line, Inc.*, 286 F.2d 721, 741 [sic] (5th Cir. 1961)).[7]  As stated in *Biggs v. Wilson:*

> [Section 206(b)] directs every employer to pay the minimum wage. *The obligation kicks in once an employee has done covered work in any workweek.* To us, 'shall pay' plainly connotes shall make a payment. If a payday has passed without payment, the employer cannot have met his obligation to 'pay.'

*Id.*, 1 F.3d 1539 (9th Cir. 1993) (emphasis added).

While payments in excess of minimum wage may, under certain circumstances, be carried forward to the next pay period, **the employee must receive, at the very least, minimum wage for all hours worked on his regular and customary pay date**. *See e.g., Olson* at 1570, 1576.  As stated in *Barrentine v. Arkansas-Best Freight System, Inc.*, "The principal congressional purpose in enacting the Fair Labor Standards Act of 1938 was to protect all covered workers from substandard wages and oppressive working hours, 'labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers.'" 450 U.S. 728, 739 (1981)(citing 29 U.S.C. § 202(a)). The FLSA was designed to ensure that each employee covered by the Act would receive "[a] fair day's pay for a fair day's work and would be

---

[7]*See also Biggs v. Wilson*, 1 F.3d 1537, 1538, 1539 (9th cir. 1993)("We . . . hold that under the FLSA wages are 'unpaid' unless they are paid on the employees' regular payday."); *Mitchell v. Mitchell Truck Line, Inc.*, 286 F.2d 721, 725 (5th Cir. 1961)("[The employer] was required under the Act to . . . pay minimum wages . . . . It certainly did not . . . since there was substantial worktime not compensated for as such. Nor was it shown by the employer to be within the statutory minimum on the basis of wages actually paid."); *Herman v. Fabri-Centers of America, Inc.*, 308 F.3d 580, 591 (6th Cir. 2002); *Calderon v. Witvoet*, 999 F.2d 1101, 1107 (7th Cir. 1993)(employer's retention of "any part of the minimum wage past the end of the pay period violates the FLSA"); 29 C.F.R. § 531.35(employer may not reduce the wage below the statutory minimum to collect a debt to the employer); *accord Brennan v. Veterans Cleaning Service, Inc.*, 482 F.2d 1362, 1369 (5th Cir. 1973); *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 (Liquidated damages provision of FLSA "constitutes a Congressional recognition that failure to pay the statutory minimum **on time** may be so detrimental to maintenance of the minimum standard of living 'necessary for health, efficiency, and general well-being of workers' and to the free flow of commerce, that double payment must be made in the event of delay in order to insure restoration of the worker to that minimum standard of well-being")(emphasis added)).

protected from the evil of overwork as well as underpay." *Id.* at 739 (internal citations and quotations omitted). "The FLSA is to be liberally construed to provide broad coverage." *Donovan v. I-20 Motels, Inc.*, 664 F.2d 957, 959 (5th Cir. 1981)(citing *Mitchell v. Lublin, McGaughy & Assocs.*, 358 U.S. 207, 211 (1959)). Here, plaintiff argues she did not receive **even the minimum wage for the hours worked during certain pay periods** - *an argument distinguishable from one where minimum wage was paid, however, full payment owed above minimum wage was not received timely.*

The Court now addresses the findings of the court below:

1. **Plaintiff failed to show defendant's "Underpayment of Wages Due" policy "constitute[s] a common 'policy or plan' violative of the FLSA."**

With regard to finding no. 1, the Magistrate Judge relied upon *Newton v. City of Henderson*, 47 F.3d 746 (5th Cir. 1995), citing the following language:

> "**An employer who is armed with [knowledge that an employee is working overtime] cannot stand idly by and allow an employee to perform overtime work without proper compensation, even if the employee does not make a claim for the overtime compensation.**" Forrester v. Roth's I.G.A. Foodliner, Inc., 646 F.2d 413, 414 (9th Cir.1981). . . [H]owever. . .if 'the employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation of § 207.' Id. . . . The City established specific procedures to be followed in order to receive payment for overtime. An employee was required to submit a request for overtime within 72 hours of the time worked and to use a specified payroll form. Newton ignored these procedures. If we were to hold that the City had constructive knowledge that Newton was working overtime because Freeman had the ability to investigate whether or not Newton was truthfully filling out the City's payroll forms, we would essentially be stating that the City did not have the right to require an employee to adhere to its procedures for claiming overtime.

[Doc. 80, p.12 (citing *Newton* at 748-749)(emphasis added)]

The Court declines to read *Newton* as broadly as did the court below. In *Newton*, the court held an employer had no liability for failing to pay overtime because, under the facts of the case, the employer had *no reason to know* that the employee was working overtime hours. *Id.* at 748-50. The

9

plaintiff employee was a city police officer, assigned to a federal Drug Enforcement Agency task force for approximately four years. While working on the task force, the plaintiff accumulated overtime hours for which he was not compensated by the city. The city had a personnel policy that required employees to obtain approval prior to working overtime. Plaintiff did not obtain approval for the majority of the overtime hours he worked. On certain occasions when plaintiff did seek authorization to work overtime, his employer denied his request, telling him the City could not afford to pay him overtime. Plaintiff submitted time reports to the City and was paid for all hours he claimed on the time reports. While he did submit a separate time report to the DEA, which reflected the overtime hours he claimed in his lawsuit, he knew the DEA forms were not for payroll purposes, and he did not present the DEA forms to the City until he resigned.[8] Moreover, plaintiff never made a demand for payment of unauthorized overtime hours until he resigned.

In his FLSA lawsuit, the plaintiff argued the city should have known about his overtime hours, because he reported to them on a daily basis. Although plaintiff admitted he did not specify the number of hours he had been working during these daily meetings, he nevertheless argued the City must have known he was working overtime. While plaintiff's supervisors admitted they knew the type of work plaintiff was doing likely required unscheduled work hours, they both testified they assumed plaintiff was taking "flex time," such that he never worked more than his authorized hours in a given pay period.

The district court entered judgment for the plaintiff after a bench trial. The Fifth Circuit reversed, stating "[i]n light of the fact that . . . [plaintiff's supervisor] explicitly ordered [plaintiff]

_____

[8]"Under the agreement entered into by the City and the DEA, the City remained plaintiff's employer and was responsible for 'establishing the salary and benefits, including overtime, of the ... [City] officer assigned to the Task Force, and making all payments due [him].'" *Newton* at 747.

not to work overtime and in light of the fact that [plaintiff] admits that he never demanded payment for overtime already worked, it is clear that access to information regarding the Task Force's activities, standing alone, is insufficient to support the conclusion that the City should have known that [plaintiff] was working overtime." *Id.* at 748.  The Fifth Circuit additionally found, "Since it was reasonable for . . . [plaintiff's supervisors] to assume that . . . [plaintiff] was taking flex time to compensate for unscheduled hours worked, it was reasonable for . . . [plaintiff's supervisors] to rely on . . . [plaintiff's] payroll submissions as a reliable indicator of the number of hours being worked by Newton." *Id.* at 749.

In contrast, here, *plaintiff* is **alleging** defendant **failed to pay her minimum wage for hours worked; she has not made any claim for unpaid "overtime wages."**[9]  Furthermore, ***plaintiff alleges* the store manager created the schedule for plaintiff and all other employees at the store at which plaintiff worked**.[10]   Additionally, according to plaintiff, this matter does not involve "unauthorized work hours of which Cingular is or was unaware." [Doc. 81, p.4]  Rather, plaintiff asserts the "excess hours" (*i.e.* hours exceeding 19 hours per week) **"were scheduled and assigned to them by the store supervisor."** [Doc. 81, p.4]  Furthermore, **"[t]he hours were entered by the supervisor on the employees' time sheets** on the store computer prior to the commencement of the workweek, and appeared on the store computer time sheet in the 'scheduled hours of work' section at the end of the pay period, prior to the time entry deadline." [Id.] (emphasis added)  Accordingly, plaintiff argues unlike *Newton*, "the relevant 'excess' hours were authorized by the employer," and

---

[9]"Overtime wages" and "minimum wages" are regulated by different sections of the FLSA.  29 U.S.C.A. §§ 206, 207.

[10]To this Court's knowledge, defendant has not contested this allegation, nor any of the subsequent allegations in the paragraph above.

Cingular had *actual knowledge* of the number of "excess" hours plaintiff worked "because the store supervisor scheduled the hours, and the work was performed literally under the store supervisor's nose." [Id.] Additionally, plaintiff asserts "[u]nlike *Newton*, the employer had no right to expect the employee could take 'flex time' off in lieu if [sic] being paid minimum wage for all hours worked in the next check." [Doc. 81, p.5]

Accordingly, the Court finds the general rule provided in *Newton* when dealing with a claim for *overtime* - "An employer who is armed with [knowledge that an employee is working overtime] cannot stand idly by and allow an employee to perform overtime work without proper compensation, even if the employee does not make a claim for the overtime compensation." - is equally, if not more applicable to a claim for minimum wage; however, the remainder of the portion of *Newton* cited by the Magistrate Judge is distinguishable under the facts of this case. *Newton* at 748 [alterations in original]. Additionally, the Court finds the following guidance from the Fifth Circuit to be applicable to the matter at hand:

> [T]he mandate of the statute is directed to the employer and 'he may not escape it by delegating it to others.' The 'duty rests on the employer to inquire into the conditions prevailing in his business. He does not rid himself of that duty because the extent of the business may preclude his personal supervision, and compel reliance on subordinates. He must then stand or fall with those whom he selects to act for him. * * * the duty must be held personal, or we nullify the statute * * *.' 'The cases must be rare where prohibited work can be done within the plant, and knowledge or the consequences of knowledge avoided' . . . [quoting <u>Lenroot v. Interstate Bakeries Corporation</u>.] 146 F.2d [325] at 328 [8ᵗʰ Cir. 1945].
>
> . . . [A]n employer's knowledge is measured in accordance with his 'duty * * * to inquire into the conditions prevailing in his business.' We are told that 'The cases must be rare where prohibited work can be done within the plant, and knowledge or the consequences of knowledge avoided.' With these principles in mind we need only inquire whether the circumstances of the present case were such that the employer either had knowledge . . . [of FLSA violations], or else had 'the opportunity through reasonable diligence to acquire knowledge.' <u>People ex rel. Price v. Sheffield Farms-Slawson-Decker Co.</u>, . . . 121 N.E. [474] at 476 [(N.Y. 1918)(Cardozo, J.)].

*Gulf King Shrimp Co. v. Wirtz*, 407 F.2d 508, 512 (5th Cir. 1969).[11]

In light of the foregoing, particularly those assertions of fact by plaintiff which remain undisputed and the policy considerations behind the FLSA, the Court finds a determination of whether or not defendant's payment policy violated the FLSA is not a matter for determination at this juncture and under this particular summary proceeding. Defendant's "Underpayment of Wages Due" policy, *on its face*, violates the FLSA **when there is a failure to pay minimum wage to an employee on his or her regular pay date, for each hour worked during that pay period.** Defendant's policy of permitting payments **of earned minimum wage** to be rolled over to a subsequent paycheck would, it seems, be basis for a violation of the FLSA on its face. *See Olson, Mitchell, Biggs, Barrentine, supra.* Accordingly, the Court finds plaintiff has asserted a colorable claim that defendant's payment policy violated the FLSA, at least to the extent it permits underpayment of minimum wages.

2.      **Plaintiff failed to show "there are similarly situated potential opt-in plaintiffs, even assuming the policy was violative of the FLSA."**

With regard to finding no. 2, the Magistrate Judge based his conclusion on the following:

> The evidence in the record demonstrates plaintiff failed to turn in her exception time hours on a timely basis, and from this, the plaintiff argues the Underpayment of Wages Due procedures led to a wage payment less than minimum wage. Plaintiff then speculates since this was a national policy, others across the country must also have failed to turn in their hours, resulting in the same underpayment.

---

[11]Although the language quoted above was stated in a case involving a violation of § 212(c) of the FLSA ("child labor provisions"), the quoted language has been relied upon in other FLSA contexts, such as claims involving overtime and minimum wage violations. *See e.g. Allen v. Board of Public Educ. for Bibb County*, 495 F.3d 1306, 1319 (11th Cir. 2007); *Reich v. Department of Conservation and Natural Resources, State of Ala.*, 28 F.3d 1076, 1082 (11th Cir. 1994); *American Federation of State, County and Mun. Employees v. Louisiana ex rel. Dept. of Health and Hospitals*, 2001 WL 29999, *14 (E.D.La.); *Bull v. U.S.*, 68 Fed.Cl. 212, 225 (Fed.Cl. 2005).

> The jurisprudence is consistent that, although the standard is lenient, there must be at least some factual showing of similarly situated employees who actually desire to opt-in to the litigation. The undersigned has found no authority where a single plaintiff's affidavit and his or her "information and belief" there are other similarly situated employees was enough to meet the threshold.

[Doc. 80, pp. 13-14] Although no citation is provided to the evidence in the record upon which the Magistrate Judge relied for this conclusion, the Court assumes it is defendant's assertion that "[p]laintiff frequently failed to timely submit her timesheets in conformity with Defendants' policies, conduct for which she was counseled." [Doc. 48, p.6]

In support of the foregoing statement, defendant refers the Court to the affidavit of its Area Retail Sales Manager, Anne Rachal, who states: "I had conversations with Ms. Landry [plaintiff's supervisor] about Plaintiff's failure to complete and turn in her timesheets before the time entry deadline. Plaintiff was counseled about the need to improve on this issue." [Doc. 48-2, ¶14] In Ms. Landry's affidavit, she also states "Ms. Sandoz routinely failed to submit her timesheets before the applicable deadline . . . ." [Doc. 48-3, ¶8] However, both affidavits are silent as to whether, and if so, how often, *plaintiff's supervisor might have failed* "to verify the time and enter it into the web based time entry system before 10:00 a.m. CT on the following Monday," which potentially could have resulted in paychecks totaling less than minimum wage for certain pay periods in violation of the FLSA.[12] [Doc. 17, p.3]

Plaintiff argues:

> Under the admitted facts in this case provisional certification is appropriate unless the Court assumes that of literally thousands of part time Retail Sales

---

[12]Regardless of who was at fault for the late submission of time, under the facts of this case, that would appear to be a distinction without a difference. As discussed more fully above, defendant appears (from what is currently before the Court) to have had actual knowledge of the number of hours plaintiff worked in any given pay period, and thus was in violation of the FLSA when it failed to pay plaintiff, *at the very least*, the applicable minimum hourly wage for <u>all</u> hours worked in a particular pay period.

> Consultants nationwide Sandoz was the only one who was late turning in her manual time sheets. That obviously false assumption aside, Cingular concedes that its practice was to pay the "default" 19 regular hours and roll over pay for excess hours to later pay periods whenever a store manager missed the 10:00 a.m. Monday deadline for entering actual work time on the computer. Sandoz contends this was a regular occurrence in her store.

[Doc. 34-1, p.5] The Court notes this argument, but also, suggests at this juncture, the issue as presently debated might beg the question of the existence of a policy, which on its face, allows for a violation of the Act.[13]

Because plaintiff has alleged in her complaint and the motion before the Court that defendant impermissibly delayed payment to its employees for "exception time" if the store manager failed to verify the hours worked in a timely fashion, that her manager's failure to timely enter exception time "was a regular occurrence in her store" [Docs. 1-1, ¶7, 34-1, p.5], that the store manager created the employees' schedule (including all regular hours *and* exception time), and that the store manager then supervised those employees for whom she had created the schedule, coupled with the fact that none of the foregoing factual allegations have been disputed by defendant, at this juncture, the Court can only conclude defendant "either had knowledge . . ., or else had 'the opportunity through reasonable diligence to acquire knowledge [of the FLSA violations].'" *Gulf King Shrimp Co.* at 512. If the policy and practice (as written, and as described to this Court by defendant) applied only to

---

[13]The Court additionally notes plaintiff argues:

> Defendant argues certification for notice requires affidavit evidence or opt-in petitions identifying other employees that were underpaid. Because there is no class discovery in an FLSA representative action at the notice stage, (and Plaintiff did not engage in unapproved notice or solicitation of potential claimants) a more lenient standard is applied. What is required for notice purposes is evidence of "commonality of interests", *e.g.* a substantial allegation that putative class members were the victims of a single decision, policy, or plan infected by discrimination.

[Doc. 49, p.5]

untimely submitted or untimely approved "exception time" wages in amounts over and above the federal mandatory minimum wage with a "roll over" procedure for payment in the next pay period, and did not, on its face, permit payments of less than minimum wage for the weeks worked, perhaps defendant's argument would be stronger.  However, here the defendant has a policy which not only allows, but compels[14] deferral of payment for untimely submitted or approved timesheets, resulting in circumstances where the deferral can result in payments of less than *minimum wage for the weeks worked* (and indeed does appear to have resulted in payments of less than minimum wage to plaintiff on certain occasions).  The policy again, on its face, appears to be nationwide, and defendant has not asserted, in any fashion, that the foregoing procedure and policy was unique to this particular store.[15] For these reasons, the Court finds defendant's policy of rolling over payment of "excess time" into the next pay period could violate the employer's duty under the FLSA, if and when the rolling over

---

[14]As the reader may recall, the policy stated in pertinent part:

To ensure accurate payment on payday, the employee and supervisor **must** verify the time reported and ensure it is entered by the time entry deadline. . . .

When the payment falls below wages earned and the department does not notify the Payroll Office prior to the submission deadine/Payroll cut off . . ., the employe, via their manager . . ., may request special payment processing . . . .  Once entered, the correction will automatically flow to PeopleSoft for payment on the employee's next paycheck.  If special processing is requested, the payment will be processed when administratively feasible based on the payroll processing cycle and volume of requests.

. . .

Underpayments can occur for a variety of reasons and will be corrected by Cingular once they are researched and verified.  Some of the underlying causes of underpayments include, but are not limited to, exception time reported incorrectly or in error . . ., exception time not reported or not reported timely . . . .

[See pp. 4-5, *supra*; *see also* Doc. 67-2]

[15]The declarations of Kathleen K. Holdridge (defendant's Payroll Director) and of Anne Rachal (defendant's Area Retail Sales Manager) indicate these were national policies and procedures. [Doc. 48-1, -2]

16

of payment results in a paycheck consisting of less than minimum wage for all hours worked during that pay period.[16]

Thus, the Court finds although plaintiff has presented minimal evidence, the evidence presented presents, at least, a colorable claim of violation of the FLSA found by way of operation of an argued nationwide policy and thus, the presentation made is sufficient to satisfy, at this juncture, the "fairly lenient standard" required at the "notice stage" of an FLSA collective action. *Mooney v. Aramco Services Co.*, 54 F.3d 1207 (5th Cir. 1995), *abrogated on other grounds* in *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003)("Because the court has minimal evidence [at the "notice stage" of a § 216(b) collective action], this determination is made using a fairly lenient standard, and typically results in "conditional certification" of a representative class.")  While it is true plaintiff has submitted no other affidavits to support her contention a provisional class is warranted, what she has shown is the existence of a nationwide written policy by her employer, which on its face permits (and appears to require by its very terms) late payment of wages in certain defined circumstances, which could  include late payment of mandatory minimum wages if the policy is applied as written.

-----

[16]For example, assume the minimum wage rate is $5.15 per hour (as it was at the time plaintiff was employed by defendant), an employee is assigned "standard hours" of 20 hours per week, and the employee's wage rate is $9.36 per hour (plaintiff's highest wage during her employment).  If in any given week that employee is scheduled to work his or her standard 20 hours, as well as 17 excess hours, but due to untimely submission or approval of his or time sheet is paid only for the standard hours, there would be a violation of the FLSA.  Under such a scenario, the employee would have been paid $187.20 (20 standard hours * $9.36 = $187.20), whereas the employee should have been paid $190.55 to be in compliance with the FLSA ($5.15 * 37 actual hours = $190.55).  Thus, the employee would have received $3.35 less than the minimum wages owed.

However, if the same employee worked only 16 excess hours during a week for which he was only paid his standard hours (with the excess hours being rolled over to the next pay period), there would be no violation of the FLSA.  Under this scenario, the employee would be paid $187.20 (20 standard hours * $9.36 = $187.20), whereas pursuant to the FLSA, the employee must be paid $185.40 (20 standard hours + 16 excess hours * $5.15 = $185.40); thus, the employee was paid $1.80 more than the mandatory minimum wage for the hours worked.

Accordingly, plaintiff's motion for provisional certification of a collective action cannot be denied *at this time*, as defendant requests, without any opportunity for discovery, albeit, perhaps limited in time, scope and nature, because, at this point, the Court can not find plaintiff has presented a frivolous claim. Accordingly, the Court finds it to be appropriate to certify a "conditional" collective action at this time (though a narrower class than proposed by plaintiff) and revisit later whether a collective action can be maintained, after limited discovery has been conducted.[17]

Due to the foregoing, the Court finds plaintiff has presented sufficient information to include any employees in the conditional, provisional class who worked at the same location as plaintiff at the relevant times. However, prior to sending notice to employees of any other store locations, the parties will be required to meet with the Magistrate Judge for a Rule 16 conference, for the purpose of developing an efficient and effective discovery plan, which is tailored to identify which, if any of defendant's other store locations might operate so as to create the proportion between "standard hours," the actual number of scheduled hours, and the wage rate, such that the result would be a violation of the FLSA.[18] Accordingly, the parties are ORDERED to jointly contact the Chambers

---

[17]*See* of interest, *e.g. Lima v. International Catastrophe Solutions, Inc.*, 493 F.Supp.2d 793, 799 (E.D.La. 2007)("It is true that the Plaintiffs present no affidavits of workers employed by other subcontractors besides C.L.S., but a review of the Defendants' pay records and agreements to subcontract will easily reveal whether a common plan existed to improperly pay overtime salaries. It seems appropriate to certify the collective action at this time and revisit the question later after some discovery. If the allegations regarding the C.L.S. and ICS contract prove to be true, it would be reasonable to conclude that ICS may also have engaged in these same practices with other subcontractors. It is unlikely that the other subcontractors' workers received a different rate of pay or did substantially different work. If sufficient evidence is not developed to demonstrate that the other subcontractors were not involved in the same alleged scheme or practice, the Court may decertify the collective action as to those parties after sufficient discovery is conducted.")

[18]While this Court contemplates perhaps 30(b)(6) depositions may suffice to provide plaintiff with any stores where the proportion between "standard hours," the actual number of scheduled hours and the wage rate potentially resulted in violations of the FLSA, it is left to the parties and the Magistrate Judge to determine how best to proceed.

of Magistrate Judge Patrick J. Hanna within seven days of issuance of this Ruling to schedule the

Rule 16 conference at the magistrate's pleasure.

**3.    "[P]laintiff has failed to make substantial allegations that the putative record keeping violations['] class members were victims of any plan, policy, or decision that violated the cited record keeping requirements."**

As to the allegations defendant violated certain record keeping regulations contained in the

Code of Federal Regulations, the Court finds plaintiff has failed to show she has standing to assert

a claim for any such violations.  Rather, the regulations appear on their face to vest such a right of

action solely with the Secretary of Labor, and plaintiff has not shown this Court otherwise.

Accordingly, plaintiff's motion for provisional class certification for "Class II (Record keeping

Violations) is DENIED.[19] [Doc. 34-1, p.11]

---

Additionally, the Court notes defendant has submitted evidence that sometime during January of 2006, it had fully implemented a new "time and attendance system," which "recorded in 'real time' the hours worked by the employees; thus, eliminating the delay in payroll processing caused by an employee's failure to complete and promptly turn in her time sheets or a supervisor's delay in verifying and entering exception time into the system." [Doc. 48-1, ¶¶14, 15] Accordingly, the Court finds any discovery allowed should likely be limited temporally, and in scope.

[19]The Court notes however, a violation of defendant's record keeping obligations may give rise to burden shifting at trial if plaintiff shows:

> [T]he employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes . . . . In such a situation . . . an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946) *superceded by statute on other grounds*, Portal-to-Portal Act of 1947, *as recognized in IBP, Inc. v. Alvarez*, 546 U.S. 21, 41 (2005).  Courts interpreting FLSA claims such as plaintiff's routinely allocate the burden of proof under the method suggested by *Anderson. See e.g. Donovan v. Grantham*, 690 F.2d 453, 458 (5th cir. 1982); *Von Friewalde v. Boeing Aerospace Operations, Inc.*, 339 Fed.Appx. 448, 455 (5th Cir. 2009); *In re Williams*, 298 F.3d 458, 463 (5th Cir. 2002); *Rosales v. Lore*, 149 Fed.Appx. 245, 246 (5th Cir. 2005); *Grunberg v. City of*

## Conclusion

In light of the foregoing, plaintiff's Motion for Conditional Class Certification (resubmitted) [Doc. 67] is GRANTED IN PART, AS MODIFIED herein, and DENIED IN PART.  The motion is granted only to the extent it seeks *provisional certification* of a class for minimum wage violations; however, plaintiff must modify the proposed class in conformity with this Ruling.  The motion is DENIED to the extent it seeks provisional certification of a "Record Keeping Violations" class.  Counsel are ORDERED to jointly contact the Chambers of Magistrate Judge Hanna within seven days of this Ruling to schedule a Rule 16 conference, for the purpose of developing an appropriate discovery plan, in accordance with this Ruling.  Thereafter, plaintiff is to submit, within the deadline to be set by the Magistrate Judge, a revised, proposed Notice Form for potential class members, in conformity with this Ruling, for the Magistrate Judge's approval.  Finally, on or before the deadline to be set by the Magistrate Judge, defendant may submit a motion to decertify the class, should the facts warrant same.

THUS DONE AND SIGNED in Lafayette, Louisiana, this ___28___ day of May, 2010.

COPY SENT
DATE 5-28-10
BY CR
TO PJH / pj

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE

---

*New Orleans*, 38 F.3d 568 (5th Cir. 1994).